1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    AHCOM, LTD.,                    )  Case No. 07-1139 SC
                                     )
8              Plaintiff,            )  MEMORANDUM OF DECISION,
                                     )  FINDINGS OF FACT AND
9         v.                         )  CONCLUSIONS OF LAW
                                     )
10                                   )
     HENDRIK SMEDING, LETTIE SMEDING,)
11   and DOES 1-15, inclusive,       )
                                     )
12             Defendants.           )
                                     )
13                                   )
                                     )
14                                   )
                                     )
15                                   )
                                     )
16   _____)

17   **I.    INTRODUCTION**

18         This case concerns the alleged default by Nuttery Farms, Inc.

19   ("NFI") on a series of contracts for sale of almonds to Plaintiff

20   Ahcom, Ltd. ("Plaintiff" or "Ahcom").  Defendants Hendrik Smeding

21   ("Mr. Smeding") and Lettie Smeding ("Mrs. Smeding") (collectively,

22   "Defendants" or "the Smedings") are the sole shareholders of NFI.

23   ECF No. 80 ("Defs.' Trial Br.") at 2.  Plaintiff contends that it

24   entered into a series of contracts to purchase a total of 580 tons

25   of almonds from NFI, and that NFI defaulted on those contracts.

26   ECF No. 127 ("Pl.'s Supp. Trial Br.") at 1.  Plaintiff submitted

27   the dispute to arbitration at the Waren-Verein in Germany and

28   obtained an award of approximately $1.6 million.  Defs.' Trial Br.

United States District Court
For the Northern District of California

at 2.  Plaintiff now seeks to pierce the corporate veil of NFI and enforce the arbitration award against the Smedings.  Plaintiff asserts claims for: (1) alter ego; (2) confirmation of foreign arbitration award; and (3) breach of contract.  See ECF No. 45 ("FAC").

The Court held a three-day bench trial, lasting from July 25, 2011 to July 27, 2011.  The Court, by this Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court concludes that the Smedings are not the alter egos of NFI.  Accordingly, the arbitration award cannot be enforced against the Smedings in their personal capacity, and the Smedings are not liable for any alleged breach of contract by NFI.

## II.  **FINDINGS OF FACT**

### A.   **The Parties**

1. Ahcom is a United Kingdom limited liability corporation in the business of buying and selling dried fruit and nuts.  Adam Hacking is Ahcom's sole shareholder.  RT 9:10-14, 73:9-11 (Testimony of Adam Hacking (hereinafter "AH")).[1]

2. The Smedings are the sole shareholders of NFI.  They began selling dried fruit and nuts as college students in approximately 1977.  RT 254:3-18 (Testimony of Hendrik Smeding (hereinafter "HS")).  In 1985, they incorporated their business under the name Nuttery Farms, Inc. ("NFI").  RT 256:8-9 (HS).  NFI is a corporation involved in the purchase and sale of commodities,

---

[1] "RT" refers to the Transcript of Record from the trial.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    namely nuts and dried fruits.  Pl.'s Ex. 46 ("Hendrik Smeding

2    Decl.").

3        B.    **Relevant Non-Parties**

4            3.  James Redfern ("Redfern") is the owner of S.J.

5    Redfern, Ltd., a commodity brokerage firm.  Redfern Dep. at 4:20-

6    5:9.[2]  Redfern has been employed as a broker in the edible nut

7    markets since 1978.  Id. at 5:15-17.  He has acted as a broker for

8    NFI since 2002.  Id. at 7:14-16.  He served as the broker for the

9    transactions between Ahcom and NFI at issue in this dispute.  Id.

10   at 11:13-12:11.

11       C.    **The Disputed Transactions**

12           4.  Ahcom and NFI began doing business with each other in

13   the sale of cashews and almonds in 1997 and have done millions of

14   dollars in business with each other since then.  RT 9:25-10:3,

15   76:7-24 (AH).

16           5.  In early 2004, Redfern brokered a series of

17   transactions (hereinafter "the disputed transactions") between NFI

18   and Ahcom, which provided for NFI to sell to Ahcom several hundred

19   metric tons of almonds for delivery beginning in fall 2004 and

20   continuing through March 2006.  RT 23:21-36:4 (AH); Pl.'s Exs. 27-

21   34 ("Redfern Confirmations").

22           6.  Mr. Smeding asked Redfern to serve as the broker for

23   the disputed transactions.  Redfern Dep. at 14:9-15.  Mr. Smeding

24   authorized Redfern to sell the almonds in the disputed transactions

25   on behalf of NFI.  Id. at 13:10-16.

26

27   _____

28   [2] Redfern did not appear at trial.  His deposition testimony was
     read into the record but was not transcribed.  RT 138:12-17.

3

**United States District Court**
For the Northern District of California

7.   Redfern faxed confirmations of the disputed transactions (hereinafter "Redfern Confirmations") -- one for each twenty tons of almonds -- to Ahcom and NFI.  RT 22:13-17 (AH), RT 298:15-299:24 (HS).  Each Redfern Confirmation contained the following provision for arbitration before the Waren-Verein[3] in text prominently displayed as "Special Remarks":

> AS PER THE EXPORT CONTRACT FOR DRIED FRUIT, TREE NUTS AND KINDRED PRODUCTS, ADOPTED BY THE CALIFORNIA DRIED FRUIT EXPORT ASSOCIATION EFFECTIVE MARCH 1989. - ARBITRATION IN ACCORDANCE WITH THE RULES OF WAREN VEREIN - INTERNATIONAL PARTICIPATION PERMITTED - SHALL BE COMPETENT FOR FINAL SETTLEMENT OF ALL AND ANY DISPUTE ARISING THEREFROM.

See Redfern Confirmations.

8.   NFI did not object to the Waren-Verein arbitration provision in the Redfern Confirmations.  RT 311:19-22 (HS); Redfern Dep. at 34:2-23.

9.   Every time that Redfern brokered a transaction for NFI, beginning in 2002, he sent a similar confirmation to NFI that provided for arbitration before the Waren-Verein.  Redfern Dep. at 17:9-12, 34:2-23.  NFI never objected to the inclusion of an arbitration provision in any confirmation prepared by Redfern.  Id. at 34:2-23.

10.   Mr. Smeding never expressed to Redfern that he believed he had to sign a written contract before becoming obligated to perform the transactions executed by Redfern.  Id. at 17:22-18:1.  NFI performed the majority of the contracts that

---

[3] The Waren-Verein is a trade association located in Hamburg, Germany.  It regulates and promotes trade in various goods, including nuts and dried fruits.  It also provides arbitration services for disputes involving these goods.  RT 23:5-14 (AH).

4

Redfern brokered on its behalf.  Id. at 21:4-15.  No one from NFI ever contended that NFI was not bound by the contracts because it had not signed a written agreement.  Id. at 20:6-12.

       11.  Michael Becker ("Becker"), another broker frequently used by NFI, specifically discussed with Mr. Smeding the availability of arbitration before the Waren-Verein.  Becker Dep. at 21:4-23:22.[4]  In 2000, Becker provided Mr. Smeding with an English translation of the arbitration rules relating to arbitration before the Waren-Verein.  Id.  Mr. Smeding told Becker that he felt protected by a Waren-Verein arbitration clause because the California Dried Fruit Export Association usually declared itself incompetent to arbitrate international disputes.  Id.  Mr. Smeding specifically asked Becker to include a Waren-Verein arbitration provision in his transaction confirmations whenever he executed a trade for NFI.  Id.

       12.  Becker never received written authorization from Mr. Smeding to act as a broker for NFI.  Becker Dep. at 19:15-20. Redfern did not specify whether he received written authorization to act as a broker for NFI, but his testimony suggests that all authorizations took place over the telephone.  Redfern Dep. at 41:20-22.  Becker testified that written broker authorizations are uncommon in the fruit and nut trading business.  Becker Dep. at 19:14-20:20.  Trading usually occurs quickly with communication taking place by telephone.  Id.

       13.  Whenever Ahcom purchased almonds, its custom and practice was to send a signed confirmation entitled "Purchase

---

[4] Becker did not appear at trial.  Excerpts of his deposition were read into the record but were not transcribed.

United States District Court
For the Northern District of California

Contract" to the seller requesting that the seller confirm the
terms of the deal.  RT 15:6-11 (AH); see, e.g., Pl.'s Ex. 26 at 1
("Purchase Contract").  These Purchase Contracts stated: "Please
sign and return the enclosed copy to acknowledge your acceptance of
the sales contract.  Failure to do so within seven days shall
constitute acceptance of the terms and conditions contained
therein."  Id.  The Purchase Contracts further provided that all
disputes would be arbitrated before the Waren-Verein.   Id.

14.   Whenever Ahcom did business with NFI prior to the
disputed transactions, Ahcom sent a Purchase Contract to NFI, and
NFI returned a signed copy to Ahcom.  RT 56:13-17 (AH), 291:11-18
(HS).  NFI never objected to the Waren-Verein provision in the
Purchase Contracts.  RT 56:23-57:9 (AH).

15.   The parties dispute whether Ahcom sent Purchase
Contracts to NFI for the disputed transactions.  RT 16:14-21,
67:15-20 (AH); RT 292:24-293:3, 314:24-315:16 (HS).  Copies of
Purchase Contracts for the disputed transactions were received into
evidence, but these copies are not signed by NFI.  See Pl.'s Exs.
24-32, 34.

16.   In 2004, several of NFI's suppliers defaulted on
contracts, refused to sell to NFI, or restricted the amount of
product they would sell to NFI, preventing NFI from being able to
execute purchase contracts sufficient to cover its sales contracts.
RT 287:15-288:7 (HS).

17.   In the fall of 2004, Ahcom sent NFI shipping
instructions in anticipation of the first scheduled delivery of
almonds.  NFI did not respond.  RT 39:10-20, 54:3-5 (AH).  NFI did

not make the first scheduled delivery in October 2004.  Pl.'s Ex. 78.

18.  On November 23, 2004, Ahcom faxed NFI a letter stating: "In absence of any shipping details regarding the above and after numerous requests for the same . . . we hereby give you three days final respite to furnish the details, failing which we will either buy them against you or proceed to arbitration under Waren-Verein Arbitration."  Pl.'s Ex. 85.

19.  On November 26, 2004, Hacking sent Mr. Smeding an email demanding assurances that performance would be forthcoming.  Pl.'s Ex. 86.

20.  On November 29, 2004, Ahcom's attorney sent NFI a letter requesting further assurances that the alleged contracts would be performed.  Pl.'s Ex. 78.

21.  Mr. Smeding sent Hacking an email on November 29, 2004, stating in pertinent part: "ANY DISPUTE WE MAY HAVE REGARDING THE OCTOBER SHIPMENTS OF THE ALMONDS CAN BE SETTLED AS YOU HAVE ALREADY INDICATED WITH ARBITRATION."  Id.

22.  NFI did not deliver any of the almonds called for in the disputed transactions.  RT 36:11-13 (AH).

23.  Ahcom sustained $1,484,000 in damages from NFI's failure to deliver the almonds.  RT 57:16-58:16 (AH); Pl.'s Ex. 104.

24.  On November 30, 2004, Ahcom submitted the matter to arbitration before the Waren-Verein.  On April 25, 2006, an arbitral panel at the Waren-Verein rendered judgment in favor of Ahcom and awarded $1,428,000 plus interest.  Pl.'s Exs. 1-2 ("Waren-Verein Judgment") at 3.

**United States District Court**
For the Northern District of California

25. NFI filed for bankruptcy in 2006.  Pl.'s Ex. 102.

**D.    Alter Ego**

26.  Articles of Incorporation for NFI were filed on January 9, 1985.  Defs.' Ex. 501.

27.  Bylaws for NFI were signed on April 10, 1985. Defs.' Ex. 502.

28.  Stock was issued to Mr. Smeding and Mrs. Smeding in return for a contribution to capital of $3,900.  HS Dep. at 48:25-49:4.[5]

29.  After their initial $3,900 capital contribution, the Smedings did not contribute any other funds to NFI.  HS Dep. at 48:25-49:4.

30.  Mr. Smeding is the president and treasurer of NFI and owns 5,000 of the corporation's 10,000 shares of stock.  RT 285:3-22 (HS).

31.  Mrs. Smeding is the vice president and secretary of NFI and owns 5,000 of the corporation's 10,000 total shares of stock.  RT 285:3-22 (HS).

32.  NFI operated for twenty-one years and completed more than $100 million in total sales.  RT 280:15-19 (HS).

33.  NFI and the Smedings used different attorneys.  RT 278:7-9 (HS).

34.  NFI and the Smedings had different telephone numbers.  RT 278:5-6 (HS).

35.  NFI and the Smedings always maintained separate bank accounts and did not commingle assets.  RT 274:14-275:3, 277:17-

---

[5] Excerpts from the deposition of Mr. Smeding were read into the record.

United States District Court
For the Northern District of California

1  278:2 (HS).

2        36.  NFI has always maintained an office separate from

3  the Smedings' residence.  The offices were located on properties

4  not owned by the Smedings and were rented by NFI.  RT 273:19-274:13

5  (HS).

6        37.  Over the years, NFI has had several employees, all

7  of whom were paid with funds from NFI accounts.  RT 275:17-276:4

8  (HS).

9        38.  The Smedings borrowed money from NFI on one occasion

10  to remodel their home.  The amount was approximately $500,000.  The

11  loan was documented with a promissory note and reflected in NFI's

12  corporate tax returns.  The Smedings paid the loan back in full in

13  approximately 2002.  They also paid interest at a rate of six

14  percent, which was the same rate that NFI was paying on its line of

15  credit at the time.  RT 279:11-280:14 (HS).

16        39.  With the exception of an automobile designated for

17  both personal and corporate use and the $500,000 loan, the Smedings

18  have not used corporate assets for their own use or benefit.  RT

19  276:5-277:5 (HS).

20        40.  NFI carried liability insurance in the amount of

21  $2,000,000.  RT 277:9-13 (HS).

22        41.  The Smedings have never held themselves out as

23  liable for the debts of NFI.  RT 278:10-12 (HS).

24        42.  NFI conducted annual shareholders meetings.  RT

25  258:23-259:1 (HS).

26        43.  The minutes of NFI's shareholders meetings reflect

27  business decisions taken and are typical of the minutes of a

28  closely held corporation.  RT 259:15-265:10 (HS); Defs.' Exs. 504-

9

United States District Court
For the Northern District of California

1   527 ("NFI Shareholder Mtg. Mins.").

2          44.  In May 2003, NFI obtained a $700,000 line of credit

3   from Vintage Bank.  The line of credit was secured by a Deed of

4   Trust on a ranch property owned by the Smedings.  Pl.'s Ex. 111.

5   The bank documentation for the loan states: "The Smedings have used

6   the Nuttery Farm over the years to help purchase real estate assets

7   and grow their net worth."  Id. at 2.  Mr. Smeding testified that,

8   besides drawing a salary from NFI, neither he nor his wife ever

9   used NFI to acquire real estate.  RT 272:18-21 (HS).  The loan

10  documents further state that the Smedings "borrowed from the

11  company to meet their personal investment goals."  Pl.'s Ex. 111 at

12  2.  Mr. Smeding testified that this statement was false.  RT 273:3-

13  5 (HS).

14      E.   **Destruction of Evidence**

15         45.  NFI used a desktop computer during the course of its

16  operations to store financial data and send email.  HS Dep. at

17  16:2-22.  Sometime after the filing of this action, the Smedings

18  dumped the computer into a horse trailer they used to collect

19  garbage.  Id. at 17:1-25, 60:3-7.  Mr. Smeding testified that no

20  financial data would have remained on the computer because he

21  deleted it over time, as outstanding bills were paid and payments

22  due were received.  Id. at 16:4-10, 17:8-12.  Mr. Smeding also

23  testified that all of the source information for any of the entries

24  made on the computer had been produced during discovery.  RT 306:2-

25  4 (HS).

26         46.  During Mr. Smeding's deposition, Plaintiff's counsel

27  stated: "Well, I should tell you that I do want all documents

28  relating to Nuttery Farms and all computer systems and all copies

10

**United States District Court**
For the Northern District of California

of disks retained as the rules require."  Defense counsel replied:
"we'll make the trailer available to you."  Plaintiff's counsel
responded: "I don't want to go dumpster diving.  I just want to see
the records."  Id. at 60:17-24.

47.   Sometime after Mr. Smeding's deposition, Mr. Smeding
disposed of the computer as part of "cleaning up the affairs after
bankruptcy."  RT 308:8-12, 310:14-15 (HS).

III.  **CONCLUSIONS OF LAW**

A.  **Alter Ego**

The issue of alter ego arises most often in the context of
corporations which, like NFI, are closely held, family-owned
entities.  "There is no litmus test to determine when the corporate
veil will be pierced; rather the result will depend on the
circumstances of each particular case."  Mesler v. Bragg Mgmt. Co.,
39 Cal. 2d 290, 300 (1985).  "[T]he doctrine is essentially an
equitable one and for that reason is particularly within the
province of the trial court.  Only general rules may be laid down
for guidance."  Assoc. Vendors, Inc. v. Oakland Meat Co., 210 Cal.
App. 2d 825, 837 (Ct. App. 1962).  The two general rules
established by the California Supreme Court are: "(1) that there be
such unity of interest and ownership that the separate
personalities of the corporation and the individual no longer
exist, and (2) that, if the acts are treated as those of the
corporation alone, an inequitable result will follow."  Mesler, 39
Cal. 2d. at 300.

When applying these rules to particular cases, California
courts have considered a variety of factors, including: commingling

of assets; diversion of corporate assets to personal use; whether
the individual defendants held themselves out as personally liable
for the debts of the corporation; whether the individual defendants
acted in bad faith; whether the individual defendants entered into
contracts with the intent to avoid performance by using the
corporate entity as a shield against personal liability; whether
the individuals and corporation used the same office; whether they
employed the same attorney; whether the individuals used the
corporation to procure labor, services and merchandise for another
person or entity; whether the individuals failed to adequately
capitalize the corporation; and whether the individuals failed to
maintain minutes or adequate corporate records.  Assoc. Vendors,
210 Cal. App. 2d at 838-840 (collecting cases).

Taking these factors into consideration, the Court finds that
the Smedings are not the alter egos of NFI.  The evidence at trial
showed that NFI maintained offices separate from the Smedings'
residence and not owned by the Smedings; the Smedings and NFI
employed different attorneys; the Smedings did not hold themselves
out as liable for the debts of NFI; NFI held bona fide
shareholders' meetings annually and made legitimate business
decisions at those meetings; and NFI and the Smedings maintained
separate bank accounts and did not commingle funds.  There is no
evidence of disregard for corporate formalities or of fraudulent
intent by the Smedings in forming NFI over twenty years ago.

Furthermore, while the Smedings did borrow money from NFI on
one occasion, they properly documented the loan and paid it back in
full, plus a fair rate of interest.  These careful steps to
structure the loan as an arms-length transaction demonstrate

United States District Court
For the Northern District of California

respect for the separate corporate identity of NFI and a lack of
intent to abuse the corporate form.

Plaintiffs' primary argument for alter ego liability is that
NFI was undercapitalized, allowing the Smedings to unfairly shift
all risk of loss to NFI's creditors.  Whether this is true is a
close question, as there is no bright-line test for deciding when a
corporation is undercapitalized.  Nevertheless, the Court finds
that Plaintiff has not met its burden of proof on the issue.  The
Smedings made an initial capital contribution of $3,900 to NFI at
its inception when expected sales were small.  As the corporation's
sales grew over time, the Smedings did not contribute more capital.
Defendants' expert Stuart Harden testified that additional capital
was unnecessary because NFI employed a business strategy of
entering into matching forward contracts to buy and sell a
commodity, thereby mitigating the company's exposure.  RT 360:13-19
(Testimony of Stuart Harden (hereinafter "SH")).  Harden further
testified that, in the event that a supplier might default on a
purchase contract and leave NFI exposed on a corresponding sales
contract, paid-in capital was not necessarily required to protect
NFI's creditors.  Rather, NFI could reasonably rely on its line of
credit or its ability to sell other commodities to generate the
cash required to cover its sales contracts.  RT 362:3-363:16 (SH).

Plaintiff contends that NFI dramatically shifted its business
strategy in 2004 by entering into a large number of sales contracts
with the knowledge that it could not offset these liabilities with
corresponding purchase contracts.  Plaintiff offered expert
testimony from Hacking, in which Hacking opined that NFI pursued a
short-sale strategy beginning in 2004.  RT 47:14-25 (AH).  Under

13

1  this strategy, NFI entered into far more sales contracts in 2004

2  than in 2003 and did not enter into corresponding purchase

3  contracts.  Id.  This strategy amounted to placing a bet that the

4  price of almonds would decrease before performance on the purchase

5  contracts became due, which would allow NFI to buy the almonds it

6  had already sold at a price below the sale price.  Id.

7       Cross-examination revealed numerous errors in Hacking's

8  calculations, and Hacking conceded that he had not considered all

9  of NFI's contracts in preparing his assessment.  RT 105:21-113:24

10 (AH).  Harden's testimony that NFI did not require higher

11 capitalization is supported by the fact that NFI operated

12 successfully for nearly twenty years with adequate cash flow to

13 cover its liabilities.  The Court finds Harden's testimony more

14 persuasive on this issue.  The Court thus finds that a

15 preponderance of the evidence does not support Plaintiff's theory

16 that NFI deliberately pursued a short-sale strategy without

17 adequate resources to cover its sales contracts in the event that

18 the prices of almonds increased.

19      Additionally, the Court finds that, even if NFI were

20 undercapitalized, piercing the corporate veil would not be

21 justified in this case.  Undercapitalization is but one of the

22 factors to consider in an alter ego inquiry.  Assoc. Vendors, 210

23 Cal. App. 2d at 838-840.  As noted supra, the majority of factors

24 pertinent to the alter ego inquiry weigh against piercing the veil

25 in this case.

26      Lastly, the Court cannot conclude that an inequitable result

27 will flow from not imposing alter ego liability in this case.

28 Ahcom knew that it was dealing with a corporation.  RT 82:10-12

**United States District Court**
For the Northern District of California

14

1   (AH).  Ahcom had engaged in millions of dollars of business with

2   NFI prior to NFI's default.  Findings of Fact ("FF") ¶ 5.  The

3   Smedings never represented to Ahcom that they were personally

4   liable for the debts of NFI.  RT 99:21-23 (AH).  Ahcom does not

5   contend that it relied on the Smedings' personal assets in doing

6   business with NFI.  The fact that a creditor will remain

7   unsatisfied if the corporate veil is not pierced does not in itself

8   constitute an inequitable result that compels a finding of alter

9   ego liability.  As set forth in <u>Associated Vendors</u>:

> Certainly it is not sufficient to merely show
> that a creditor will remain unsatisfied if the
> corporate veil is not pierced, and thus set up
> such an unhappy circumstance as proof of an
> "inequitable result."  In almost every instance
> where a plaintiff has attempted to invoke the
> doctrine, he is an unsatisfied creditor.

14  210 Cal. App. 2d at 842.

15      Plaintiff argues that not piercing the veil will produce an

16  inequitable result because Defendants placed a bet on a volatile

17  commodity market knowing they did not have the money necessary to

18  pay the debt if their bet proved wrong.  The Court finds that a

19  preponderance of the evidence does not support this contention.

20      **B.    <u>Agreement to Arbitrate and Breach of Contract</u>**

21      Plaintiff's second claim for confirmation of the arbitration

22  award and third claim for breach of contract necessarily require a

23  finding of alter ego liability in order for Plaintiff to prevail.

24  As the FAC makes clear, Plaintiff seeks to confirm the arbitration

25  award against the Smedings as individuals on an alter ego theory.

26  FAC ¶¶ 13-14.  Likewise, Plaintiff seeks to hold the Smedings

27  liable for the alleged breach of contracts by NFI on an alter ego

28  theory.  FAC ¶ 16.

**United States District Court**
For the Northern District of California

Because the Court finds that the Smedings are not the alter egos of NFI, it finds that the arbitration award is not enforceable against the Smedings, and the Smedings are not liable for any alleged breach of contract by NFI. Because NFI is not a party to this suit, the Court is without jurisdiction to address whether the arbitration agreement is enforceable against NFI or whether NFI is liable for breach of contract.

C. **Destruction of NFI's Computer**

Plaintiff argues that Defendants spoliated evidence by disposing of NFI's office computer. Pl.'s Tr. Br. at 9. Plaintiff asks the Court to impose default judgment, shift the burden of proof to Defendants, or impose an adverse inference against Defendants because of their conduct. Id. at 13. The Court finds that Defendants' actions violated the Federal Rules of Civil Procedure and that some sanction is therefore warranted. However, based on the evidence presented at trial, the Court finds that Defendants' conduct, while troubling, is highly unlikely to have materially impacted the outcome of this case. Accordingly, the Court finds that the severe sanctions requested by Plaintiff are unwarranted and imposes a monetary sanction instead.

The trial court has broad discretion to fashion, on a case-by-case basis, an appropriate sanction for spoliation. Id. However, sanctions resulting in dismissal or entry of default judgment are authorized only in "extreme circumstances" where the spoliation is "due to willfulness, bad faith, or fault" and results in such unfair prejudice that no lesser remedy can cure the harm. Kahaluu Constr., 857 F.2d at 603.

16

United States District Court
For the Northern District of California

Spoliation of evidence occurs when a party (1) destroys evidence after receiving notice that the evidence was potentially relevant to litigation; and, in so doing, (2) impairs the non-spoiling party's ability to go to trial, or threatens to interfere with the rightful decision of the case.  United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co., 857 F.2d 600, 604 (9th Cir. 1988); United States v. Kitsap Physicians Svc., 314 F.3d 995, 1001 (9th Cir. 2002).  Sanctions for spoliation of evidence may be imposed under the court's inherent powers, or alternatively, if the spoliation violates a court order, under Federal Rule of Civil Procedure 37(b).  See Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363, 367-68 (9th Cir. 1992).

Here, Defendants' disposal of the computer unquestionably constitutes spoliation of evidence.  Mr. Smeding testified that he used the computer to keep track of NFI's accounts received and accounts payable.  FF ¶ 48.  Such financial information is potentially relevant to aspects of the alter ego inquiry, such as whether NFI and the Smedings commingled assets and whether the Smedings diverted corporate assets to their personal use.  Mr. Smeding had notice of the relevance of this information from Plaintiff's discovery requests and specifically from Plaintiff's counsel's remarks at Mr. Smeding's deposition.  FF ¶ 49. Nevertheless, Mr. Smeding disposed of the computer in the course of "cleaning up the affairs after bankruptcy."  FF ¶ 50.

Defendants seek to justify their actions by noting that Plaintiff never filed a motion to compel production of the computer.  However, Defendants' obligation to produce potentially relevant information is not contingent on Plaintiff filing a motion

17

**United States District Court**
For the Northern District of California

to compel them to do so.  Defendants' actions plainly violated their discovery obligations under Federal Rule of Civil Procedure 26.  The Court therefore finds the imposition of sanctions necessary to preserve the integrity of the judicial process.

Nevertheless, the sanctions Plaintiff seeks are excessive in this case.  Despite Defendants' reprehensible failure to produce the computer, Plaintiff had access to extensive information about the finances of the Smedings and of NFI, including personal and corporate bank account statements, personal and corporate tax returns, and loan documentation.  The availability of secondary sources of evidence to compensate for the despoiled evidence lessens any risk of prejudice at trial.  See Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc., 306 F.3d 806, 825 (9th Cir. 2002).  The Court finds that the secondary sources of financial information available to Plaintiff lessened the likely prejudice to Plaintiff's case from the destruction of NFI's computer.

Courts have held that a party failing to preserve relevant evidence may be subject to monetary sanctions where a request for more drastic sanctions is denied.  See Kopitar v. Nationwide Mut. Ins. Co., 266 F.R.D. 493, 501 (E.D. Cal. 2010) (awarding fees and costs incurred in drafting motion for spoliation sanctions). Pursuant to its inherent authority, the Court finds that monetary sanctions are warranted in this case.  The Court awards $4500 to Plaintiff for its efforts pursuing this issue and raising it with the Court.

///

///

///

United States District Court
For the Northern District of California

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court enters judgment in favor of Defendants Hendrik Smeding and Lettie Smeding and against Plaintiff Ahcom, Ltd., on Plaintiff's claims for alter ego, confirmation of arbitration award, and breach of contract.

The Court ORDERS Defendants to pay Plaintiff $4500 as a monetary sanction for Defendants' failure to preserve the computer.


IT IS SO ORDERED, ADJUDGED, AND DECREED.


Dated: August _8_, 2011



UNITED STATES DISTRICT JUDGE